UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

FANI KOKKOROS, et al.,

　　　　Plaintiffs,

　　v.

EQUINITY TRUST COMPANY,

　　　　Defendant.

Case No.  25-cv-01853-EMC

**ORDER GRANTING FIFTH THIRD BANK'S MOTION TO DISMISS**

Docket No. 55

Plaintiffs are trustees for the Spilios Mousalimas Trust ("SM Trust").[1]  Plaintiffs initially sued several defendants, including Jody Lon Millard, Equinity Trust Company ("Equiniti"), and Fifth Third Bank, N.A. ("Bank").  According to Plaintiffs, Mr. Millard fraudulently represented to Equiniti – a licensed stock transfer agent – that he had the right to certain securities and stock dividends belonging to the SM Trust.  The Bank issued a guarantee for Mr. Millard's signature, and, as a result, Equiniti transferred SM Trust assets (worth more than $1.99 million) to Mr. Millard.

After Plaintiffs voluntarily dismissed their claims against the Bank, Equiniti filed its own complaint against the Bank.  According to Equiniti, it relied on the Bank's guarantee of Mr. Millard's signature – and the Bank's agreement to indemnify Equiniti for any related loss – in making the transfer to Mr. Millard.  Now pending before the Court is the Bank's motion to dismiss

---

[1] Plaintiffs are two individuals.  Fani Kokkoros became the trustee of the SM Trust after the settlor/trustor Spilious Mousalimas died or became unable to serve as trustee.  *See* Compl. ¶ 1. Ms. Kokkoros appointed Nick G. Tarlson as a special trustee for the SM Trust.  Mr. Tarlson is a CPA and has been serving as the accountant and tax preparer for the trustee.  *See* Compl. ¶ 2.

Equiniti's third-party complaint. The Bank moves to dismiss based on lack of personal jurisdiction, improper venue, and failure to state a claim for relief. Having considered the parties' briefs and accompanying submissions, the Court hereby **GRANTS** the Bank's motion. The Court lacks personal jurisdiction over the Bank.

## I.    FACTUAL & PROCEDURAL BACKGROUND

A.    Plaintiffs' Complaint and Equiniti's Third-Party Complaint

In their complaint, Plaintiffs allege as follows. Spilios Mousalimas created the SM Trust in 1999. The beneficiaries of the SM Trust are two cancer research and treatment facilities in Greece. *See* Compl. ¶ 12. Plaintiffs are the current trustees of the Trust.

Mr. Millard "is an individual who purports to reside in Aurora, Ohio," although "Plaintiffs cannot be certain of his true name or place of residence." Compl. ¶ 6. Equiniti is a licensed stock transfer agent. *See* Compl. ¶ 3. Fifth Third (the Bank) is a national bank which participates in the Medallion Guarantee Program. *See* Compl. ¶ 4.

> A medallion signature guarantee is a special stamp that is used to transfer securities. It confirms that the signature authorizing the transfer is genuine and that the signer has the legal capacity and authority to sign the document. . . . If a signer is not a customer of the participating financial institution, it is unlikely the financial institution will guarantee the customer's signature.

Compl. ¶ 4. Signature guaranties are obtained so as to avoid liability for a wrongful registration of a security. *See* Compl. ¶ 16.

In or about November 2021, January 2022, and July 2022, Mr. Millard fraudulently represented to Equiniti and the Bank that he had the authority to act on behalf of the SM Trust, that he was the beneficial owner of certain shares of common stock held by the SM Trust, and/or that he had lost the share certificates. Mr. Millard requested that the shares be replaced in a new account in his name. Mr. Millard executed Stock Power Forms for the stocks transfers, and Mr. Millard's signature on each form was guaranteed by the Bank.[2] *See* Compl. ¶¶ 6, 18-20 & Exs. A-

---

[2] At the bottom of each Stock Power Form, there is a section titled "Medallion Signature Guarantee." It states:

> All current owners or authorized individual(s) must sign their name

2

C (Stock Power Forms).  Equiniti subsequently registered and transferred the shares to Mr. Millard.  *See* Compl. ¶¶ 3, 24.  Mr. Millard also received a check representing stock dividends for some of the shares.  *See* Compl. ¶ 22.  Altogether, Mr. Millard fraudulently obtained more than $1.99 million.  *See* Compl. ¶ 23.

Based on, *inter alia*, the above allegations, Plaintiffs initially asserted three claims for relief:

    (1) Wrongful registration and transfer of securities (against Equiniti and Mr. Millard).

    (2) Default under the Medallion Guaranty Indemnity Agreement (against the Bank who, as guarantor of Mr. Millard's signature, had an obligation to indemnify Equiniti).

    (3) Failure to indemnify by issuer of surety bond (against Travelers, who issued a surety bond to ensure the Bank would comply with its indemnity obligations).

Subsequently, Plaintiffs voluntarily dismissed the second and third causes of action above (without prejudice).  This left only the claim for wrongful registration and transfer against Equiniti and Mr. Millard.  *See* Docket No. 23 (notice).

Although Plaintiffs dismissed *their* claims against the Bank, Equiniti thereafter filed its own (third-party) complaint against the Bank, asserting that Equiniti relied on the signature guarantees provided by the Bank, *see* 3PC ¶ 10, and that the Bank was "strictly liable to Equiniti under [1] the Medallion Signature Guarantee Program and under [2] the California Commercial Code, including but not limited to Sections 8115 and 8306."[3]  3PC ¶ 7 (emphasis omitted).

---

and have the signature guaranteed by a member of a Medallion Stamp Program.  An authorized individual must write their capacity (title) in the space below.  The Medallion Guarantor may require additional documentation.  The undersigned does (do) irrevocably constitute and appoint Equiniti Trust Company attorney to transfer the said stock on the books of said Company with full power of substitution in the premises.  Medallion Signature Guarantees can be obtained from financial institutions, including commercial banks, brokers, and credit unions.

Compl., Exs. A-C (Stock Power Forms).

[3] *See, e.g.*, Cal. Comm. Code § 8306(b) ("A person who guarantees a signature of the originator of an instruction warrants that at the tie of signing all of the following were true: (1) The signature

3

Thus, Equiniti pled causes of action for: (1) contractual indemnity and (2) statutory indemnity.

- For the contractual indemnity claim, Equiniti alleges that the Bank has an obligation to fully indemnify under the Medallion Guarantee Program.  Equiniti provides (as Exhibit 3 of the third-party complaint) a copy of an indemnity agreement that the Bank signed, apparently as part of the program.

- For the statutory indemnity claim, Equiniti relies on California law, but, in a footnote, cites New York law as an alternative.  *See* 3PC at 3 n.1 ("If and to the extent that the strict liability provisions of the California Commercial Code are held to be inapplicable in this case, then Fifth Third Bank's strict liability to Equiniti will be established by the parallel strict liability provisions of the Uniform Commercial Code ('UCC') under New York law.").)

B.     Evidence Related to the Bank's Contacts with California

As noted above, the Bank has moved to dismiss on the basis of, *inter alia*, lack of personal jurisdiction.  In conjunction with the motion, both the Bank and Equiniti have submitted evidence related to the Bank's contacts with California.  That evidence reflects as follows.

- The Bank is a national banking association headquartered in Ohio, and with a principal place of business in Ohio.  *See* Ross Decl. ¶ 2.[4]

- Beginning in 2007, the Bank registered to do business in California (and thus also

---

was genuine.  (2) The signer was an appropriate person to originate the instruction, or if the signature is by an agent, the agent had actual authority to act on behalf of the appropriate person, if the person specified in the instruction as the registered owner was, in fact, the registered owner, as to which fact the signature guarantor does not make a warranty.  (3) The signer had legal capacity to sign."); *id.* § 8306(f) ("A person who guarantees an instruction requesting the transfer of an uncertificated security makes the warranties of a signature guarantor under subdivision (c) and also warrants the rightfulness of the transfer in all respects."); *id.* § 8306(h) ("The warranties under this section are made to a person taking or dealing with the security in reliance on the guaranty, and the guarantor is liable to the person for loss resulting from their breach.  An endorser or originator of an instruction whose signature, endorsement, or instruction has been guaranteed is liable to a guarantor for any loss suffered by the guarantor as a result of breach of the warranties of the guarantor.").

[4] Thomass Ross is the Director of Corporate Real Estate Transactions for the Bank.  *See* Ross Decl. ¶ 1.

United States District Court
Northern District of California

United States District Court
Northern District of California

designated an agent for service of process in California). *See* Suter Decl. ¶ 6; *see also* Suter Decl. ¶ 8 (noting that the Bank is registered with the California Franchise Tax Board).

- Since 2007, the Bank has been a litigant in 499 California lawsuits (federal or state). Of the 499 lawsuits, the Bank was the plaintiff in 222. *See* Suter Decl. ¶ 10.

- Before this lawsuit was filed in January 2025 and before Equiniti filed its third-party complaint in December 2025, the Bank did not offer any retail banking services in California. According to the Bank, it did have a presence in California but it was "small" and "limited to commercial and wealth management." Ross Decl. ¶ 4; *see also* Ross Decl. ¶ 6 (testifying that "Fifth Third's presence in California during the events alleged in this lawsuit was limited to commercial offices, that only serviced businesses"). Equiniti contends that the distinction the Bank has drawn "between . . . retail and commercial banking activities" is "artificial" and "without legal significance, since the entity is the same in either case." Suter Decl. ¶ 15. Furthermore, Equiniti disputes the Bank's characterization that its commercial banking operations in California were small. Equiniti has provided evidence that the Bank had six commercial banking offices in California as of June 2024. *See* Suter Decl. ¶ 7 & Ex. 3 (press release by the Bank announcing opening of sixth commercial banking office in California). Equiniti has also provided evidence that, for the year 2025, 11% of the Bank's $73.5 billion commercial loan and lease portfolio came from California. *See* Suter Decl. ¶ 5 (citing the Bank's Annual Report for 2025).

- In February 2026 – after Plaintiffs initiated this lawsuit and after Equiniti filed its third-party complaint – the Bank closed a merger with Comerica Bank and thus acquired Comerica's retail branches in California. *See* Ross Decl. ¶ 3; *see also* Ross Decl. ¶ 5 (testifying that, before the merger, the Bank did not serve any banking customers in California). Equiniti provides evidence that, following the acquisition, the Bank became "the 9th largest bank in the U.S." Suter Decl. ¶ 4

(citing the Bank's Annual Report for 2025); *see also* Suter Decl. ¶ 9, Ex. 5 (compiling addresses of Comerica Bank retail offices in California – over 90 total).

- In its reply brief, the Bank provides for the first time information about where its employees are located. *See* Supp. Ross Decl. ¶ 7 (testifying that, as of March 2026, the Bank had approximately 19,000 employees located in 48 states plus D.C.; approximately 44% were located in Ohio and only 1% in California). Arguably, the Court should strike that evidence because the Bank could, and should, have provided the information as part of its opening brief. However, even if the Court does ignore the reply evidence, that has no material impact on the Court's analysis.

## C.    Terms of Indemnity Agreement

In addition to the above, the only other relevant evidence before the Court is the Bank's indemnity agreement which is attached to Equiniti's third-party complaint as Exhibit 3. *See also* Suter Decl., Ex. 8 (indemnity agreement). The agreement is titled "Indemnity Agreement for Financial Institution Enrollees." The Bank signed the agreement in or about July 2004, presumably as part of the Medallion Guarantee Program. *See* Suter Decl. ¶ 12. Below are the relevant terms of the agreement.

- The indemnity agreement is directed to "**any** issuer of securities, transfer agent, registrar, redemption agent, depository, trustee, paying, distributing or disbursing agent, bank, trust company, credit union, savings institution, mutual fund, broker/dealer, or similar financial services institution, and their respective legal representatives, successors and assigns (collectively 'Agents and Issuers')." 3PC, Ex. 3 (emphasis added). There is no specified issuer, transfer agent, etc. who formally countersigned the agreement. *See also* Opp'n at 8 (emphasizing that the "indemnity agreement is not a bilateral contract with a specific counterparty" but rather "is an open, standing promise addressed to, *inter alia*, any issuer of securities, transfer agent, and so forth). It is not clear whether the Bank provides a copy of the indemnity agreement to, *e.g.*, a stock transfer agent when the Bank guarantees a signature.

United States District Court
Northern District of California

- The Bank (referred to in the agreement as the "Guarantor") "has adopted . . . a STAMP Imprint for the purpose of executing guaranties of signatures (within the meaning of Section 8-306 of the Uniform Commercial Code) and for the purpose of executing other certifications and guaranties incident to the transfer, payment, exchange, purchase or delivery of securities . . . ." 3PC, Ex. 3.

- The Bank "agree[s] (a) to indemnify and hold harmless Agents and Issuers . . . from and against any and all claims (whether groundless or otherwise), losses, liabilities, damages and expenses . . . arising out of or in connection with the transfer, payment, exchange, purchase or delivery of securities in reliance upon the Imprint, or, if Guarantor's negligence shall have contributed substantially thereto, an impression or imprint resembling or purporting to be the Imprint, when used as aforesaid . . . ." 3PC, Ex. 3.

- The indemnity agreement "shall be deemed a New York contract" and "shall be governed as to all matters whatsoever . . . exclusively by the laws of the State of New York applicable to agreements made and fully to be performed in the State of New York." 3PC, Ex. 3 (indemnity agreement).

- "Regardless of where actually delivered, [the] Indemnity Agreement shall be deemed to have been accepted by Agents and Issuers in the State of New York." 3PC, Ex. 3.

- "Guarantor [*i.e.*, the Bank] hereby irrevocably consents to the jurisdiction of any state or federal court located in the State of New York for all disputes arising out of or relating to this Indemnity Agreement. Guarantor hereby agrees that venue for any proceedings shall be exclusively in such state or federal court and waives (a) any objection to venue and (b) any right to require any change of venue." 3PC, Ex. 3.

/ / /

/ / /

/ / /

United States District Court
Northern District of California

## II.    DISCUSSION

A.    Legal Standard

As noted above, the Bank has moved to dismiss for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2).  The Bank has also moved to dismiss for improper venue under Rule 12(b)(3) and for failure to state a claim for relief under Rule 12(b)(6).

"When a defendant moves to dismiss for lack of personal jurisdiction, 'the plaintiff bears the burden of demonstrating that jurisdiction is appropriate.'" *Morrill v. Scott Fin. Corp.*, 873 F.3d 1136, 1141 (9th Cir. 2017).  If no evidentiary hearing is held, the plaintiff need only make a prima facie showing that there is personal jurisdiction. *See id.*  "All uncontroverted allegations in the complaint are deemed true, and factual disputes are to be resolved in favor of the non-moving party." *Id.*

"Similar to a motion to dismiss [for lack of personal jurisdiction] under Rule 12(b)(2), 'the plaintiff bears the burden of showing that venue is proper.'" *Cadence Design Sys. v. Yunjing Intelligent Innovation  Shenzhen Co.*, No. 25-cv-00317-AMO, 2026 U.S. Dist. LEXIS 55917, at *10 (N.D. Cal. Mar. 17, 2026).  Implicitly, a venue challenge – similar to a personal jurisdiction challenge – can be facial or factual in nature.  *See Meyers v. Autodesk, Inc.*, No. 4:22-CV-00074-LPR, 2022 U.S. Dist. LEXIS 184227, at *3 (E.D. Ark. Oct. 7, 2022); *Marquardt v. Blue Jay Transit, Inc.*, No. 2:26-cv-00444-CAS-SKx, 2026 U.S. Dist. LEXIS 62331, at *16 (C.D. Cal. Mar. 23, 2026).  Likewise, implicitly, for a factual challenge, a plaintiff need only make out a prima facie case of venue.  *See id.*

Finally**,** "[t]o survive a motion to dismiss for failure to state a claim after the Supreme Court's decisions in *Iqbal* and *Twombly*, [a plaintiff's] allegations must suggest that [its] claim has at least a plausible chance of success." *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1134-35 (9th Cir. 2014) (internal quotation marks omitted).  The court must assume the plaintiff's allegations are true and draw all reasonable inferences in their favor.  *See Shields v. Credit One Bank, N.A.*, 32 F.4th 1218, 1220 (9th Cir. 2022).

/ / /

/ / /

8

United States District Court
Northern District of California

B.     Personal Jurisdiction

The Bank argues first that it must be dismissed from the instant case because the Court lacks personal jurisdiction over it.

> Where, as here, there is no applicable federal statute governing personal jurisdiction, the district court applies the law of the state in which the district court sits.  Because California's long-arm jurisdictional statute is coextensive with federal due process requirements, the jurisdictional analyses under state law and federal due process are the same.  For a court to exercise personal jurisdiction over a nonresident defendant, that defendant must have at least "minimum contacts" with the relevant forum such that the exercise of jurisdiction "does not offend traditional notions of fair play and substantial justice."

*Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800-01 (9th Cir. 2004).

Here, Equiniti, as the third-party plaintiff, bears the burden of proving personal jurisdiction.  *See id.* at 800.  In its papers, Equiniti argued that there is both general and specific jurisdiction over the Bank, as well as "consent jurisdiction."  However, at the hearing, Equiniti largely admitted that its general jurisdiction and consent jurisdiction arguments are weak and thus focused solely on specific jurisdiction.  While the critical issue is that of specific jurisdiction, the Court still addresses general jurisdiction and consent jurisdiction in the interest of completeness.

1.     General Jurisdiction

A court has general jurisdiction over a defendant where the defendant's contacts with the forum are so continuous, substantial, and of such a nature that a suit against it based on dealings entirely distinct from the forum contacts is justified.  *See Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014); *see also Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 624 (2d Cir. 2016) ("General jurisdiction . . . permits a court to adjudicate any cause of action against the . . . defendant, wherever arising, and whoever the plaintiff.").  Notably, general jurisdiction does not arise simply because a defendant has continuous and systematic contacts with a forum; rather, the forum contacts must be so continuous and systematic that the defendant is essentially rendered "at home" in the forum state (and thus, any cause of action may be brought against the defendant, even if based on the defendant's conduct outside the forum state).  *See Daimler*, 571 U.S. at 127, 138-39 (stating that "the inquiry . . . is not whether a foreign corporation's in-forum contacts can

9

be said to be in some sense 'continuous and systematic,' it is whether that corporation's 'affiliations with the State are so "continuous and systematic" as to render [it] essentially at home in the forum State'").

In *Daimler*, the Supreme Court explained that, for a corporation, the paradigm forum for the exercise of general jurisdiction is the state where the corporation is incorporated or where its principal place of business is located – *i.e.*, the "equivalent" of an individual's domicile.[5] *See id.* at 137. Notably, the Court expressly rejected the plaintiff's suggestion that general jurisdiction is appropriate in every state in which the corporation engages in a substantial, continuous, and systematic course of business, stating that this formulation "is unacceptably grasping." *Id.* at 137-38.

> [T]he general jurisdiction inquiry does not "focu[s] solely on the magnitude of the defendant's in-state contacts." General jurisdiction instead calls for an appraisal of a corporation's activities in their entirety, nationwide and worldwide. A corporation that operates in many places can scarcely be deemed at home in all of them. Otherwise, "at home" would be synonymous with "doing business" tests framed before specific jurisdiction evolved in the United States.

*Id.* at 139 n.20.

The Supreme Court added that it did "not foreclose the possibility that in an **exceptional case**, a corporation's operations in a forum other than its formal place of incorporation or principal place of business may be so substantial and of such a nature as to render the corporation at home in that State." *Id.* at 139 n.19 (emphasis added). The Court identified *Perkins v. Benguet Consolidated Mining Co.*, 342 U.S. 437 (1952), as such a case.

> The defendant in *Perkins*, Benguet, was a company incorporated under the laws of the Philippines, where it operated gold and silver mines. Benguet ceased its mining operations during the Japanese occupation of the Philippines in World War II; its president moved to Ohio, where he kept an office, maintained the company's files, and oversaw the company's activities. The plaintiff, an Ohio resident, sued Benguet on a claim that neither arose in Ohio nor

---

[5] Here, of course, the Bank is not a corporation but rather a national banking association. A national bank "is a citizen of the State in which its main office, as set forth in its articles of association, is located" – and not "a citizen of every State in which it has established a branch." *Wachovia Bank, N.A. v. Schmidt*, 546 U.S. 303, 307 (2006).

10

> related to the corporation's activities in that State. We held that the Ohio courts could exercise general jurisdiction over Benguet without offending due process. That was so, we later noted, because "Ohio was the corporation's principal, if temporary, place of business."

*Daimler*, 571 U.S. at 130; *see also id.* at 130 n.8 (noting that "[a]ll of Benguet's activities were directed by the company's president from Ohio" and, "[g]iven the wartime circumstances, Ohio could be considered 'a surrogate for the place of incorporation or head office'").

Courts have emphasized that "[t]he bar for 'exceptional circumstances' is high," *Walden v. The Cooper Cos., Inc.*, No. 24-cv-00903-JST, 2024 U.S. Dist. LEXIS 171304, at *16 (N.D. Cal. Sept. 9, 2024); *see also Martinez v. Aero Caribbean*, 764 F.3d 1062, 1070 (9th Cir. 2014) (emphasizing that "*Daimler* makes clear the demanding nature of the standard for general jurisdiction"), and a plaintiff "bears a heavy burden" in asserting that a case is exceptional. *Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 627 (2d Cir. 2016). "[W]hen a corporation is neither incorporated nor maintains its principal place of business in a state, mere contacts, no matter how 'systematic and continuous,' are extraordinarily unlikely to add up to an 'exceptional case.'" *Id.* For example, in *Martinez*, 764 F.3d at 1062, the Ninth Circuit declined to find general jurisdiction even though the defendant's contacts with the forum state, California, included contracts with California companies worth between $225 and $450 million, attendance at industry conferences, promotion of products in California, and advertising in trade publications with distribution in California. *See id.* at 1070.

In the case at bar, Equiniti acknowledges that the Bank is essentially domiciled in Ohio. *See* note 5, *supra*. However, Equiniti contends that the instant case is an exceptional one warranting a holding that the Bank is still "at home" in California. In support, Equiniti cites the following contacts the Bank has or has had with California:

(1) "two decades of continuous, active [commercial] banking operations" (*i.e.*, since 2007);

(2) registration to do business in California with the California Secretary of State;

(3) designation of a California agent for service of process;

(4) payment of California Franchise Board taxes;

11

(5) "[e]xtensive use" of California courts (since 2007, involved in 499 California lawsuits, 222 of which the Bank filed as the plaintiff); and

(6) acquisition of Comerica Bank, which resulted in the addition of "more than 80 California retail banking branches to [the Bank's] portfolio."

Opp'n at 11-12.

There are several reasons why Equiniti's contention that the instant case is an exceptional one lacks merit.

First, the Court cannot consider the Bank's acquisition of Comerica Bank (number (6) above). The acquisition did not take place until after Plaintiffs filed the case at bar and until after Equiniti filed its third-party complaint against the Bank. "[P]ersonal jurisdiction depends on the defendant's contacts with the forum state *at the time the lawsuit was filed*." *Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione*, 937 F.2d 44, 52 (2d Cir. 1991) (emphasis added); *see also Gather Workspaces LLC v. Gathering Spot, LLC*, No. 19-2669 (RC), 2020 U.S. Dist. LEXIS 191723, at *12013 (D.D.C. Oct. 16, 2020) (stating that "post-complaint contacts are not relevant to the personal jurisdiction analysis," which makes sense because, otherwise, a defendant would not have any fair warning that it could be haled into court in the specific forum); *cf. Steel v. United State*s, 813 F.2d 1545, 1549 (9th Cir. 1987) (stating that "one cannot defeat personal jurisdiction by a move away from the state in which the underlying events took place").

Second, the fact that the Bank has been a litigant in the California courts hundreds of times over the past 20 years (number (5) above) – while not irrelevant – still is not enough to establish that the bank is at home in the state, at least not in the absence of additional facts. To the extent Equiniti focuses on the Bank being a plaintiff in hundreds of suits, a plaintiff's choice of forum is affected by a number of factors, including but not limited to where the *defendant* is located.[6] *See Cashland Inc. v. Cashland Inc.*, No. CIV-15-800-W, 2016 U.S. Dist. LEXIS 75237, at *30 n.21 (W.D. Okla. Jan. 14, 2016) (stating that defendants' participation in unrelated lawsuits in the forum did not provide a basis for the exercise of general jurisdiction, at least "[a]bsent any

---

[6] And in fact, in its reply, the Bank states that "the vast majority [of the cases] are . . . bankruptcy matters or are collection matters against California borrowers . . . ." Reply at 3 n.1.

United States District Court
Northern District of California

supporting authority for this position advanced by the plaintiffs"); *Wyles v. Sussman*, No. 17-CV-01868-RBJ, 2018 U.S. Dist. LEXIS 113395, at *5-6 (D. Colo. July 9, 2018) (stating that "mere participation in a separate lawsuit or lawsuits in Colorado would not establish general jurisdiction, which requires contacts 'so "continuous and systematic" as to render the defendant essentially at home in the forum State'"); *Thuney v. Lawyer's Title of Ariz.*, No. 2:18-cv-1513-HRH, 2019 U.S. Dist. LEXIS 19165, at *11 (D. Ariz. Feb. 5, 2019) (stating that "plaintiffs have not cited to any authority that stands for the proposition that a defendant's prior use of the forum's courts can be a basis for general jurisdiction," although adding that, "even if it could, these contacts with Arizona, some 26 cases over almost 30 years, are not sufficient to show that KeyBank is 'at home' in Arizona"). The Court also heeds the *Daimler* Court's statement that "the general jurisdiction inquiry does not 'focu[s] solely on the magnitude of the defendant's in-state contacts'" but rather requires consideration of a "corporation's activities in their entirety, nationwide and worldwide. A corporation that operates in many places can scarcely be deemed at home in all of them." *Daimler*, 571 U.S. at 139 n.20.

Third, three of the items above – numbers (2)-(4) – are all related to the Bank's registration to do business in California. (Registering to do business in the state means that the company has to designate a California agent for service of process and pay California taxes.) But if (per *Daimler*) a company's substantial, continuous, and systematic course of business in a forum is not enough, by itself, to establish general jurisdiction, then these items are not enough either. Registration to do business in a state is not enough to establish the corporation is at home in that state (absent consent thereby to jurisdiction as discussed below); corporations may be registered in multiple states. *Cf. King v. Am. Family Mut. Ins. Co.*, 632 F.3d 570, 575 (9th Cir. 2011) (noting that "default rule that, in the absence of broader statutory language or state court interpretations, the appointment of an agent for the service of process is, by itself, insufficient to subject foreign corporations to suits for business transacted elsewhere").

Finally, this leaves the fact that, for approximately 20 years, the Bank has had significant commercial banking operations in California. This includes having six commercial banking offices in the state and a California commercial loan and lease portfolio worth millions. *See* Suter

Decl. ¶¶ 5, 7. But again, the *Daimler* Court has explained that "the inquiry . . . is not whether a foreign corporation's in-forum contacts can be said to be in some sense 'continuous and systematic,' it is whether that corporation's 'affiliations with the State are so "continuous and systematic" as to render [it] essentially at home in the forum State.'" *Daimler*, 571 U.S. at 127, 138-39. And again, *Daimler* requires that a court consider a company's activities in their entirety, not just in the forum. This means that not only must a company's activities nationwide be considered but also its activities worldwide. Equiniti has not provided this broader information for the Court to consider. *See* Suter Decl. ¶ 5 & Ex. 1 (covering commercial loan and lease portfolio by state, but not including any worldwide information). Even if the Court were to consider only the nationwide activity related to commercial loans and leases, California is at 11% but there are several states that are not far off that mark (*e.g.*, Ohio, Texas, and Illinois are at 8% and Florida and New York are at 7%). This again suggests that the Bank is not "at home" in California.

Accordingly, based on the record before the Court, the case at bar is not an exceptional one where the Bank's contacts with California are such that it may fairly be deemed to be "at home" in the state even though it is domiciled elsewhere (in Ohio). *See also Reis v. Fifth Third Bank*, No. 8:20-cv-01189-KES, 2020 U.S. Dist. LEXIS 247003, at *7-8 (C.D. Cal. Oct. 2, 2020) (holding that court – based in California – lacked general jurisdiction over the Bank).

2. Consent Jurisdiction

Equiniti maintains that, even there is no general jurisdiction over the Bank, there is still "consent jurisdiction." Equiniti's argument is predicated on the Supreme Court's decision in *Mallory v. Norfolk Southern Railway Co.*, 600 U.S. 122 (2023). There, the Supreme Court held that a state statute requiring an out-of-state company to consent to personal jurisdiction as a condition of doing business did not violate due process.[7] *See id.* (finding controlling Supreme

---

[7] The Supreme Court acknowledged that the state statute did "not use the word 'consent' in describing the jurisdictional consequences of registration," but added that there were no "'magic words'" as to what constituted consent. *See Mallory*, 600 U.S. at 136 n.5; *see also* 42 Pa. C.S. § 5301(a)(2)(i) (2019) (providing that "[i]ncorporation under or qualification as a foreign corporation under the laws of this Commonwealth" means that there is "a sufficient basis of jurisdiction to enable the tribunals of this Commonwealth to exercise general personal jurisdiction").

United States District Court
Northern District of California

Court precedent on point – *i.e.*, *Pennsylvania Fire Insurance Co. of Philadelphia v. Gold Issue Mining & Milling Co.*, 243 U.S. 93 (1917)).

The problem for Equiniti is that, unlike the state at issue in *Mallory* (Pennsylvania), "California does not require corporations to consent to general personal jurisdiction in that state when they . . . register to do business." *AM Tr. v. UBS AG*, 681 F. App'x 587, 588-89 (9th Cir. 2017) (holding that a Swiss corporation that was registered to do business in California was not subject to general jurisdiction). And in *AM*, the Ninth Circuit pointed to California state court decisions holding that registration to do business is not enough to give rise to personal jurisdiction. *See id.* at 589 (citing *Bristol-Myers Squibb Co. v. Super. Ct.*, 1 Cal. 5th 783 (2016),[8] and *Thomson v. Anderson*, 113 Cal. App. 4th 258 (2003)). Recognizing this fact, this Court held in *Dormoy v. HireRight*, No. 23-cv-02511-EMC, 2023 U.S. Dist. LEXIS 139090 (N.D. Cal. Aug. 29, 2023), that the defendant's registration to do business in California was insufficient to establish personal jurisdiction. *See id.* at *14-15. Thus, Equiniti's assertion of "consent jurisdiction" is inherently flawed.

In its papers, Equiniti cites two cases outside this District and Circuit, suggesting that there can be consent jurisdiction simply because a company registers to do business in the state. But neither case is binding on this Court while the Ninth Circuit's *AM* decision is. Furthermore, in one of the cases that Equiniti cites, *Sloan v. Burist*, No. 2:22-cv-00076-LGW-BWC, 2023 U.S. Dist. LEXIS 199056 (S.D. Ga. Nov. 6, 2023), the district court acknowledged that the Georgia statute at issue did not expressly provide for consent jurisdiction but concluded that the statute implicitly did so because of Georgia state court decisions holding that registration *would* result in personal jurisdiction. *See id.* at *14-15. As noted above, California courts have held that registration to do business is *not* consent to personal jurisdiction.

The Court therefore rejects Equiniti's contention that there is consent jurisdiction over the Bank.

---

[8] The Supreme Court overruled *Bristol-Myers* on other grounds in *Bristol-Myers Squibb Co. v. Superior Court*, 582 U.S. 255 (2017) (focusing on specific jurisdiction).

3.      Specific Jurisdiction

This leaves only specific jurisdiction as a possible means for the Court to assert personal jurisdiction over the Bank.  As noted above, this was the focus of Equiniti's arguments at the hearing.

The Ninth Circuit uses a three-prong test for analyzing a claim of specific jurisdiction.

> (1)     The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
>
> (2)     the claim must be one which arises out of or relates to the defendant's forum-related activities; and
>
> (3)     the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Schwarzenegger*, 374 F.3d at 802.  The plaintiff has the burden of proving the first two prongs; if it does so, then the burden shifts to the defendant to "'present a compelling case' that the exercise of jurisdiction would not be reasonable." *Id.*

In its papers, Equiniti argues that the Bank either purposefully availed itself of the privilege of conducting activities in California or purposefully directed activities at California[9] because its stamp guarantee is nationwide in scope: both stock transfer agents as well as investors who hold stock can be found nationwide.  Equiniti emphasizes, in particular, the fact that investors can be found nationwide (though this does not negate the fact that the only California connection in the instant case is the SM Trust being administered in the state).  *See, e.g.*, Opp'n at 8 (contending that, "[b]y joining the STAMP Program and executing [the] indemnity [agreement], Fifth Third broadcast a standing promise to every [stock] transfer agent in the country, including Equiniti, which processes securities held by investors nationwide – knowing that: (a) the STAMP medallion would be presented to a transfer agent wherever the underlying securities were held; (b)

---

[9] Given that Equiniti has sued for contractual indemnity and statutory indemnity, one could arguably apply either a purposeful availment analysis (contract) or a purposeful direction analysis (tort).

16

that transfer agent would rely on the guarantee; and (c) if the guarantee was fraudulent, the transfer agent would suffer losses wherever the affected investor's account was maintained); Opp'n at 9 (arguing that the indemnity agreement "addressed to 'transfer agents' . . . [had] the express purpose of inducing them to rely on Fifth Third's guarantee in processing securities transfers nationwide, regardless of where the stamp was applied"; "[a] bank that issues a STAMP medallion guarantee knows, with certainty, that a transfer agent somewhere in the country will rely on it and that investors nationwide will be affected"); Opp'n at 9 (asserting that "[a] bank that issues a *fraudulent* guarantee knows that it has injected that fraud into the national securities transfer system, where it will surface wherever the victim's securities happen to be held") (emphasis in original); Opp'n at 10 (arguing that Fifth Third made a "decision to participate in a nationwide program that it knew would touch every state," including California because of California-based investors).

The Bank argues – and the Court agrees – that Equiniti's argument on prong one is a problematic stream-of-commerce theory. "The placement of a product into the stream of commerce, without more, is not an act purposefully directed toward a forum state." *Holland Am. Line, Inc. v. Wartsila N. Am., Inc.*, 485 F.3d 450, 459 (9th Cir. 2007). Furthermore, here, Equiniti has not even made an allegation nor provided any evidence suggesting that, when the Bank issued its guarantee for Mr. Millard's signature pursuant to the Medallion Guarantee Program, it knew or should have known that there would be a particular impact in California (*i.e.*, because that is where the SM Trust is administered). And even if the Bank were aware of that fact, *Holland* makes clear that "a defendant's awareness that the stream of commerce may or *will* sweep the product into the forum state does not convert the mere act of placing the product into the stream of commerce into an act purposefully directed toward the forum state." *Id.* (emphasis added); *see also Shelton v. Air & Liquid Sys. Corp.*, No. 4:21-cv-04772-YGR, 2021 U.S. Dist. LEXIS 175683, at *9 (N.D. Cal. Sept. 15, 2021). Purposeful direction or availment requires more. *See, e.g., Yamashita v. LG Chem, Ltd.*, 62 F.4th 496, 504 (9th Cir. 2023) (noting that "[t]he record does not show that [the defendant] deliberately navigate[d] the stream of commerce towards [the forum state], either by introducing these batteries into [the state] itself, or by 'creat[ing], control[ling], or

United States District Court
Northern District of California

employ[ing] the distribution system' which does so"; adding that, even if the defendant sold its products to a third-party website, "that conduct would not amount to purposeful availment without some indication that [it] was targeting the [forum state] market"); *see also Herbal Brands, Inc. v. Photoplaza, Inc.*, 72 F.4th 1085, 1092 (9th Cir. 2023) (noting that, "[i]n some cases, the operators of a website can be said to have expressly aimed at a forum where a website with national viewership and scope appeals to, and profits from, an audience in a particular state[;] [w]hen the website itself is the only jurisdictional contact, our analysis turns on whether the site had a forum-specific focus or the defendant exhibited an intent to cultivate an audience in the forum"). In providing the medallion signature guarantee and then failing to provide indemnification to Equiniti, there is nothing to suggest the Bank purposefully directed its conduct at California or purposefully availed itself of the privilege of conducting activities in California. The Bank's allegedly wrongful conduct did not occur in California, nor was it directed to California. Simply put, it had no connection to the state.

But even if Equiniti were right on the first prong of the specific jurisdiction test (purposeful direction or purposeful availment), the second prong presents an independent obstacle. *See Sharma v. Volkswagen AG*, 524 F. Supp. 3d 891, 904-05 (N.D. Cal. 2021) (assuming that plaintiffs "satisfied the first prong by sufficiently alleging that Bosch directed its contacts to California under a stream of commerce theory," but finding a problem under the second prong because plaintiffs failed to "show[] that the injuries alleged would not have occurred but-for Bosch's conduct"; plaintiffs did not identify an "act performed by Bosch in California, whether related to development or manufacturing," nor did they allege that "Bosch advertised the product in or directed communications about the product to California"). Under the second prong, the plaintiff's claim must be one which arises out of or relates to the defendant's forum-related activities. Equiniti has asserted claims for contractual and statutory indemnity against the Bank. But the Bank's issuance of the guarantee and alleged ensuing failure to indemnify Equiniti does not arise out of or relate to any of the Bank's activities in California. The Bank's alleged failure to indemnify Equiniti took place in Ohio, where the Bank is based, and the Bank's alleged failure to

18

indemnify impacted Equiniti, which apparently is based in New York and/or Minnesota.[10]  There is no California connection at all.  *See also* 3PC, Ex. 3 (indemnity agreement provision stating that, "[r]egardless of where actually delivered, [the] Indemnity Agreement shall be deemed to have been accepted by Agents and Issuers in the State of New York" – *i.e.*, the agreement to indemnify was made in New York).

The fact that the SM Trust is "based" in California (because it is administered there) does not change the analysis.  Equiniti's claim is for failure to indemnify *Equiniti*.  The fact that Equiniti made its indemnity request because of what happened to the SM Trust in California – or the fact that the Bank's stamping of Mr. Millard's signature had an impact on the SM Trust – does not change the fact that the Bank's alleged misconduct vis-à-vis Equiniti is the failure to indemnify Equiniti, a failure unconnected to California.  *Cf. O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 317 n.3 (3d Cir. 2007) (stating that specific jurisdiction is assessed on a "claim-by-claim basis").  Furthermore, because the guarantee that the Bank issued extended only to Equiniti (no promises were made to the SM Trust), the Bank could not reasonably expect that a failure to indemnify would result in it being haled into an entirely different forum where the investor happened to be  based.  *Cf. Global Commodities Trading Grp., Inc. v. Beneficio de Arroz Choloma, S.A.*, 972 F.3d 1101, 1108-09 (9th Cir. 2020) (in evaluating specific jurisdiction (both purposeful availment and purposeful direction), noting that defendant paid millions to California-based plaintiff pursuant to contracts and further induced plaintiff to continue doing business with it, and therefore "it was reasonable for [defendant] to expect that it would be haled into court in California to fulfill its obligations and to account for harm it foreseeably caused there").

Equiniti suggests that *Ford Motor Co. v. Montana Eighth Judicial District Court*, 592 U.S. 351 (2021), supports its position but it does not.  To be sure, the Supreme Court did hold in *Ford* that the second prong of the specific jurisdiction test does not require a *causal* connection.

> None of our precedents has suggested that only a strict causal
> relationship between the defendant's in-state activity and the

---

[10] Based on Plaintiffs' complaint, Equiniti is based in either New York or Minnesota.  *See* Compl. ¶ 3 (alleging that Equiniti is a New York LLC headquartered in Minnesota and that one of its officers is located in New York).

19

United States District Court
Northern District of California

> litigation will do.  As just noted, our most common formulation of the rule demands that the suit "arise out of *or relate to* the defendant's contacts with the forum."  The first half of that standard asks about causation; but the back half, after the "or," contemplates that some relationships will support jurisdiction without a causal showing.

*Id.* at 362 (emphasis in original).  But the Supreme Court expressly cautioned that this did "not mean anything goes.  In the sphere of specific jurisdiction, the phrase 'relate to' incorporates real limits, as it must to adequately protect defendants foreign to a forum."  *Id.*; *see also Yamashita*, 62 F.4th at 505-06  (in post-*Ford* decision, indicating that "relate to" can be viewed as a "prox[y] for causation, ensuring jurisdiction over a class of cases for which causation seems particularly likely but is not always easy to prove"; at least, "relatedness requires a close connection between contacts and injury").  In the instant case, Equiniti's claim for failure to indemnify cannot be related to the Bank's contacts with California because, even if the SM Trust is in California, the guarantee the Bank issued was only between itself and Equiniti.  *See id.* at 506 (noting that "relate to" can cover a situation where "the defendant should have foreseen the risk that its contacts might cause injuries like that of the *plaintiff*") (emphasis added).[11]  Equiniti's claims against the Bank have no "close connection" with California.  The claims would be the same even if the SM Trust

---

[11] For the hearing, the Court may wish to know the facts at issue in *Ford*.  *Ford* covered two different suits.  In each, an accident involving a Ford vehicle was involved, and Ford was sued in the state where the accident took place.  The Supreme Court held that there was specific jurisdiction over Ford in each state.  Ford did not dispute that it purposefully availed itself of conducting activities in the relevant states.  However, it argued that those activities (including seeking to serve the market for automobiles and related products in those states) were not sufficiently connected to the plaintiffs' claims.

> In Ford's view, the needed link must be causal in nature: Jurisdiction attaches "only if the defendant's forum conduct *gave rise* to the plaintiff's claims."  And that rule reduces, Ford thinks, to locating specific jurisdiction in the State where Ford sold the car in question, or else the States where Ford designed and manufactured the vehicle.  On that view, the place of accident and injury is immaterial.

*Ford*, 592 U.S. at 361 (emphasis in original).  The Supreme Court rejected Ford's argument and found that the plaintiffs' claims were related to Ford's forum contacts of marketing its cars and related products to the forum states.

Under *Ford*, Plaintiffs (*i.e.*, the SM Trust) might be able to argue that there is personal jurisdiction over the Bank if they were to sue the Bank in California for, *e.g.*, negligence. (Plaintiffs did not bring such a claim against the Bank, even in their original complaint).  But that is not the claim presented before the Court here.

20

were administered in, *e.g.*, Texas or another other state.

Accordingly, the Court concludes that specific jurisdiction over the Bank is lacking.

4.  "Public Policy Jurisdiction"

While the analysis above ends the matter, Equiniti also suggests in its papers that public policy considerations weigh in favor of personal jurisdiction over the Bank: "[If]f banks can issue fraudulent medallion guarantees and then escape accountability by arguing that jurisdiction exists only in their home states, the investor protection purpose of the STAMP Program is entirely undermined.  Fraudsters do not limit their schemes to states where the guarantor bank is headquartered."  Opp'n at 17.  But this argument is not compelling for several reasons.

First, Equiniti has not cited any authority holding that personal jurisdiction is proper based on public policy considerations alone.

Second, Equiniti's argument focuses on the protection of investors, but Equiniti is a stock transfer agent, not an investor.  The Court is not considering here whether there is personal jurisdiction over a claim asserted by Plaintiffs against the Bank.

Third, even if the Court were to hold that there is no personal jurisdiction over the Bank with respect to Equiniti's indemnity claims, that does not mean that the only forum where Equiniti may sue the Bank is Ohio (where the Bank is based).  Equiniti might be able to argue that there is personal jurisdiction over the Bank in Equiniti's own home state (New York or Minnesota).

Finally, Equiniti's complaint here is ultimately about the inefficiency of splitting up the investor case and the transfer agent case into two different fora.  The Court is not unsympathetic to that point.  However, multiple cases can arise where there are (as alleged) multiple tortfeasors or multiple acts affecting multiple parties.  Furthermore, there are also tools to deal with inefficiencies that may arise from the litigation of two related cases, including but not limited to coordination of discovery, stays, and possible transfer of venue.

C.   Request to Take Jurisdictional Discovery

Equiniti argues that, even if there is no personal jurisdiction based on the record presented, it should be allowed to take jurisdictional discovery to assess whether there could be personal jurisdiction.

District courts have discretion in deciding whether to permit jurisdictional discovery.

> Jurisdictional discovery "should ordinarily be granted where pertinent facts bearing on the question of jurisdiction are controverted or where a more satisfactory showing of the facts is necessary."  But "a mere hunch that discovery might yield jurisdictionally relevant facts, or bare allegations in the face of specific denials, are insufficient reasons for a court to grant jurisdictional discovery."  "The district court's refusal to provide such discovery will not be reversed except upon the clearest showing that denial of discovery results in actual and substantial prejudice to the complaining litigant."

*Yamashita v. LG Chem, Ltd.*, 62 F.4th 496, 507 (9th Cir. 2023).

In its papers, Equiniti identifies discovery that it would like to take.  *See* Mot. at 18-19.  Much of that discovery, however, is related to general jurisdiction which, as noted above, Equiniti largely conceded at the hearing does not exist.

At the hearing, Equiniti did argue that it should be allowed to take discovery into whether the Bank knew its guarantees could affect California investors.  However, that information is irrelevant.  It is predicated on Equiniti's position that specific jurisdiction can be based on a stream-of-commerce theory, but the Court has already rejected that position.  *Cf. Yamashita*, 62 F.4th at 507 ("Given our analysis of specific personal jurisdiction, most of the information [the plaintiff] seeks is clearly irrelevant . . . .").  Equiniti has not asked for any discovery (to support specific jurisdiction) tied to the transaction at issue.  Moreover, Equiniti has not made any allegations or provided any evidence even suggesting that the Bank knew or should have known about any connection that the SM Trust had to California and that it purposefully directed its conduct at California, even though Equiniti is located in New York or Minnesota.  *See id.* at 508 ("Jurisdictional discovery would be little more than a fishing expedition seeking support for jurisdictional theories one of which is farfetched . . . .").

### III.    CONCLUSION

For the foregoing reasons, the Court grants the Bank's motion to dismiss based on lack of personal jurisdiction.  There is no general jurisdiction, consent jurisdiction, or  specific jurisdiction over the Bank.  Furthermore, Equiniti has not demonstrated that jurisdictional discovery could uncover any material information that would change the result.

22

Because the Court is dismissing Equiniti's claims against the Bank for lack of personal jurisdiction, it does not entertain the other arguments made by the Bank in its motion – *e.g.*, that venue is not proper or that Equiniti has failed to state a claim for relief.  Although the Court is dismissing all of Equiniti's claims against the Bank, its ruling here does not preclude Equiniti from filing a new suit against the Bank in a different court.

This order disposes of Docket No. 55.

**IT IS SO ORDERED**.

Dated: May 1, 2026

_____
EDWARD M. CHEN
United States District Judge

United States District Court
Northern District of California

23